UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

STEVEN M. DROGO,

                        Plaintiff,

v.                                              5:13-CV-0946
                                                (GTS)
CAROLYN W. COLVIN,
Commissioner of Social Security,

                        Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

STANLEY LAW OFFICES, LLP                        JAYA A. SHURTLIFF, ESQ.
  Counsel for Plaintiff
215 Burnet Ave.
Syracuse, NY 13202

U.S. SOCIAL SECURITY ADMIN.                     DANIEL R. JANES, ESQ.
OFFICE OF REG'L GEN. COUNSEL – REGION II
  Counsel for Defendant
26 Federal Plaza – Room 3904
New York, NY 10278

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

        Currently before the Court, in this Social Security action filed by Steven R. Drogo

("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the

Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are the parties' cross-

motions for judgment on the pleadings.  (Dkt. Nos. 11, 15.)  For the reasons set forth

below, Plaintiff's motion is granted in part and denied in part and Defendant's motion is

granted in part and denied in part.

## I.    RELEVANT BACKGROUND

### A.    Factual Background

Plaintiff was born on April 6, 1978. (T. 149.)  He completed high school with an Individual Education Program ("EIP") diploma. (T. 172.)  Generally, Plaintiff's alleged disability consists of schizophrenia paranoid and psychosis. (T. 171.)  His alleged disability onset date is July 31, 2008, and his date last insured is December 21, 2013. (T. 43.) He had previously worked as a grill cook and prep cook. (T. 172.)

### B.    Procedural History

On July 30, 2010, Plaintiff applied for Social Security Disability Insurance Benefits ("SSD") under Title II and Supplemental Security Income ("SSI") under Title XVI.  Plaintiff's application was initially denied, after which he timely requested a hearing before an Administrative Law Judge ("the ALJ").  On February 17, 2012, Plaintiff appeared before the ALJ, David S. Pang. (T. 15-34.) On March 9, 2012, the ALJ issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 38-55.) On June 14, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1-7.) Thereafter, Plaintiff timely sought judicial review in this Court.

### C.    The ALJ's Decision

Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law.  (T. 43-51.)  First, the ALJ found Plaintiff met his insured date through December 13, 2013 and further, Plaintiff had not engaged in substantial gainful activity since July 31, 2008.  (T. 43.)  Second, the ALJ found Plaintiff had the severe impairments of back disorder, morbid obesity, schizophrenia, psychotic disorder, and learning disability. (*Id.*) The ALJ determined Plaintiff's medically determinable

impairments of hypertension and Eustachian tube dysfunction were non-severe impairments. (*Id.*)  Third, the ALJ found Plaintiff did not have an impairment, or combination of impairments, that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1.  (T. 44.)  The ALJ specifically considered Listing § 12.03. (*Id.*)  Fourth, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform "light work," except he could "occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs, but may never climb ladders, ropes or scaffolds. He [was] limited to simple, routine and repetitive tasks, and [could] tolerate only occasional interaction with supervisors, coworkers, and the public." (T. 45.)[1] Fifth, the ALJ determined Plaintiff could not perform his past relevant work; however, there were jobs that exist in significant numbers in the national economy Plaintiff could perform. (T. 49-50.)

## II.  THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A.  Plaintiff's Arguments

Plaintiff makes four separate arguments in support of his motion for judgment on the pleadings.  First, Plaintiff argues the ALJ did not have sufficient evidence to make a step three or RFC decision, because (1) the ALJ failed to fully develop the record and (2) the ALJ failed to follow the treating physician rule.  (Dkt. No. 11 at 9-16 [Pl.'s Mem. of Law].)  Second, Plaintiff argues the RFC finding does not completely and accurately describe Plaintiff's limitations because it is inconsistent with the ALJ's own findings.  (*Id.* at 16-18.)  Third, Plaintiff argues the ALJ failed to apply the appropriate legal standards

---

[1]     Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. §§ 404.1567(b) and 416.967(b).

in evaluating Plaintiff's credibility. (*Id.* at 18-20.) Fourth, and lastly, Plaintiff argues the Vocational Expert ("VE") testimony did not provide substantial evidence to support the denial. (*Id.* at 20-21.)

### B.    Defendant's Arguments

In response, Defendant makes essentially three arguments. First, Defendant argues the ALJ properly developed the record, and the ALJ's RFC finding is supported by substantial evidence. (Dkt. No. 15 at 6-14 [Def.'s Mem. of Law].)  Second, Defendant argues the ALJ properly evaluated Plaintiff's credibility. (*Id.* at 14-17.)  Third, and lastly, Defendant argues the ALJ properly solicited VE testimony. (*Id.* at 17-18.)

## III.    RELEVANT LEGAL STANDARD

### A.    Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B.      Standard to Determine Disability**

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. §§ 404.1520 and 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

## IV. ANALYSIS

### A. Whether the ALJ Properly Developed the Record.

After carefully considering the matter, the Court answers this question in the affirmative, in part for the reasons stated in Defendant's memorandum of law. (Dkt. No. 15 at 6-7 [Def.'s Mem. of Law]). The Court adds the following analysis.

Plaintiff argues the ALJ failed to fully develop the record regarding Listing § 12.05, because he failed to order an IQ examination. (Dkt. No. 11 at 11-12 [Pl.'s Mem. of Law].) Defendant essentially argues failure to obtain Plaintiff's IQ score is harmless because Plaintiff would not meet the other requirements of § 12.05, such as deficits in adaptive functioning. (Dkt. No. 16 at 6 [Def.'s Mem. of Law].)

At step two the ALJ discussed Listing § 12.03: Schizophrenic, paranoid and other psychotic disorders; however, the ALJ did not conduct a discussion of Listing § 12.05: Intellectual disability. Listing § 12.03 does not take a plaintiff's IQ into consideration, whereas § 12.05 does. The Plaintiff argues the ALJ erred in failing to discuss Listing §

12.05 at step two, should have ordered intellectual testing, and the ALJ's decision therefore, failed to "meaningfully consider or evaluate" the issue of Plaintiff's intellectual disability. (Dkt. No. 11 at 11-12 [Pl.'s Mem. of Law].)

The ALJ has an affirmative duty to develop the record. *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) ("[I]t is the well-established rule in our circuit that the social security ALJ. . . must on behalf of all claimants ... affirmatively develop the record. . . ." (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 [2d Cir.2009]) (internal quotation mark omitted)).  This duty exists "[e]ven when a claimant is represented by counsel," due to the "non-adversarial nature of a benefits proceeding." *Moran,* 569 F.3d at 112, (quoting *Lamay*, 562 F.3d at 509). Re-contacting medical providers is necessary when the ALJ cannot make a disability determination based on the evidence of record. *See* 20 C.F.R. §§ 404.1512(e) and 416.912(e). However, reviewing courts hold that ALJs are not required to seek additional information absent "obvious gaps" that preclude an informed decision. *Rosa v. Callahan,* 168 F.3d 72, 79 n. 5 (2d Cir. 1999); *see also Hart v. Comm'r of Soc. Sec.,* 5:07-CV-1270, 2010 WL 2817479, at *5 (N.D.N.Y. July 10, 2012).

The record contains educational records dating from 1981 through 1992, which appear to cover kindergarten through the sixth grade. (T. 250-303.) The educational records show Plaintiff had an IEP while at school. (T. 292.) An academic report dated April 27, 1992 indicated Plaintiff worked hard, but read at a 3-4[th] grade level in the sixth grade, required teacher direction, "very quickly [lost] train of thought," and was on medication for anxiety. (T. 292.) The record indicated Plaintiff was in a 15:1 classroom, but received no other services. (*Id.*) Plaintiff was labeled as "learning disabled" in 1992.

The record does not contain formal IQ testing, nor does it appear IQ testing was ever conducted, or ordered, as part of Plaintiff's EIP evaluation. (T. 299.)

Consultative examiner Dennis Noia, Ph.D. opined Plaintiff's intellectual functioning was in the borderline range and his general fund of information was "somewhat limited." (T. 673.) Plaintiff's mental health providers indicated his "intelligence [was] below average based on conversation;" however, they did not indicate IQ testing was performed, or that it was necessary. (T. 781.)

Although not completely discussed at step three, the ALJ's decision as a whole considered all the evidence in the record regarding Plaintiff's intellectual functioning. The ALJ determined Plaintiff had, "mild cognitive limitations" (T. 47) and a "severe impairment" of a learning disability at step two (T. 43).

Listing § 12.05 requires "significantly sub average general intellectual functioning with deficits in adaptive functioning." The introduction to Listing § 12.00 states: "[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A." Yet, Plaintiff's record is void of IQ testing or any implication that Plaintiff had or needed IQ testing. Absent indication IQ testing had been performed, or needed to be performed, the ALJ was not under an obligation to order IQ testing. This is consistent with the notion, where there are no "obvious gaps" in the record, the ALJ is not required to seek additional information. *Rosa,* 168 F.3d at 79.

Considering the ample records from Plaintiff's time in school, mental health providers, and the consultative examiner, the ALJ had sufficient evidence upon which to make a step three determination regarding Plaintiff's mental impairments. Given this information and lack of indication of the need for testing from school officials and health

care providers, the ALJ had sufficient evidence before him to make a determination that Plaintiff did not meet or equal a Listing, the ALJ did not err in failing to order an IQ examination, and the ALJ did not err in failing to consider Listing § 12.05.

**B.    Whether the ALJ's RFC is Supported by Substantial Evidence.**

After carefully considering the matter, the Court answers this question in the negative, in part for the reasons stated in Plaintiff's memorandum of law.  (Dkt. No. 11 at 12-8 [Pl.'s Mem. of Law]).  For ease of analysis Plaintiff's argument the ALJ failed to follow the treating physician rule will also be addressed here. The Court adds the following analysis.

The RFC is "what an individual can still do despite his or her limitations." *Melvill v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999), *see* 20 C.F.R. §§ 404.1545(a) and 416.945(a). When making a RFC determination, the ALJ considers a plaintiff's physical abilities, mental abilities, symptomatology, including pain and other limitation that could interfere with work activities on a regular and continuing basis. 20 C.F.R. §§ 404.1545(a) and 416.945(a). An RFC finding will be upheld when there is substantial evidence in the record to support each requirement listed in the regulations. *Cox v. Astrue*, 993 F.Supp. 2d, 169, 183 (N.D.N.Y. 2012), *citing LaPorta v. Bowen,* 737 F.Supp. 180, 183 (N.D.N.Y.1990).

Plaintiff received his primary mental health treatment through Liberty Resources with Scott Burnside, N.P.P. (Nurse Practitioner in Psychiatry). In February 2012, Nurse Burnside completed a medical source statement. (T. 787-789.) The medical source statement was also signed by a collaborating supervising physician. (T. 789.) The signature is not legible, but the title of "medical director" is. (*Id.*) A search of Plaintiff's

records from Liberty Resources indicated David Kang, M.D. treated Plaintiff and was the medical director with Liberty Resources. Therefore, it is reasonable to deduce, Dr. Kang signed the medical source statement completed by Nurse Burnside.

Nurse Burnside indicated he began treating Plaintiff in June of 2010 and saw him monthly for therapy and medical management every two to three months. (T. 787.) At the time the statement was completed, Nurse Burnside had been treating Plaintiff for almost two years. Nurse Burnside indicated Plaintiff suffered from psychotic NOS, morbid obesity, and had a Global Assessment Functioning ("GAF") of 58. (*Id.*)

In the medical source statement, Nurse Burnside identified Plaintiff's symptoms as: a blunt, flat or inappropriate affect; mood disturbance; difficulty thinking or concentrating; psychomotor agitation or retardation; persistent nonorganic disturbance of vision, speech, hearing, use of a limb, movement and its control, or sensation; emotional withdrawal or isolation; hallucinations or delusions; decrease need for sleep; and oddities of thought perception, speech or behavior. (*Id.*)

Nurse Burnside opined Plaintiff was "unable to meet competitive standards" in the following: ability to remember work-like procedures; ability to understand and remember very short and simple instructions; ability to work in coordination with or proximity to others without being unduly distracted; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (T. 788.)

He opined Plaintiff would be "seriously limited, but not precluded" in his ability to maintain attention for two hour segment, sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request

assistance; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine setting; deal with normal work stress; interact appropriately with the general public; adhere to basic standards of neatness and cleanliness; and travel to unfamiliar place and use public transportation. (T. 788-789.)

Nurse Burnside commented, "[b]y virtue of schizophrenia spectrum diagnosis the [Plaintiff] possesses certain negative symptomology that makes functional ability on a day to day basis very questionable. This is evidenced by nearly [two] years of [treatment] and observation." (T.788.) He further opined, "symptoms of psychotic illness can and likely will occur with the stress of forced social interaction. This is generally consistent with diagnosis and specific to [Plaintiff's] situation as observed over past [two] years." (T. 789.)

Treatment notes from Liberty Resources show an overall decrease in symptoms with medication; however, the symptoms persisted and never completely subsided, or were fully managed. In September 2010, Plaintiff had "some progress" in the area of his activities of daily living and a decrease in paranoid thinking, but he continued to experience "significant" psychotic symptoms on a regular basis. (T. 748-749.) In December 2010, Plaintiff stated he would like to be able to get out of his house more and go to the movies, mall, grocery store and concerts. (T. 754.) In March 2010, progress was noted and Plaintiff's auditory hallucinations decreased "dramatically;" however, Plaintiff continued to experience visual hallucinations and paranoid thoughts. (T. 759.) In June of 2010, Plaintiff's psychotic symptoms decreased, but he still occasionally experienced anxiety and paranoia. (T. 764.)  In June 2010, Nurse Burnside noted Plaintiff continued to have visual hallucinations and paranoid thoughts. (T. 765.)

In August of 2011, Plaintiff reported occasional psychotic symptoms, and primarily sypmtoms of anxiousness and some paranoia. (T. 769.) In December of 2011 Nurs Burnside noted continued progress. (T. 775.) However, Plaintiff reported he continued to experience visual and auditory hallucinations and paranoid thought. (T. 777.) Plaintiff received GAF scores ranging from 50 in July of 2010 to 58 in December of 2011.[2]

Dr. Noia opined Plaintiff's recent and remote memory skills were mildly impaired. (T. 673.) He concluded Plaintiff's insight and judgment were fair. (*Id.*) He observed Plaintiff was capable of: understanding and following simple instructions and directions; maintaining attention and concentration for tasks; attend a routine and maintain a schedule; and learning new tasks. (*Id.*) He further observed Plaintiff would be able to relate to and interact "moderately well" with others and would have difficulty dealing with stress. (T. 674.)

Plaintiff's primary care physician, Dr. Beckman, also provided a medical source statement regarding Plaintiff's mental health. (T. 784-786.) She opined Plaintiff would be unable to meet competitive standards in his ability to: remember work-like procedure; understand and remember very short and simple instructions; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; adhere to basic standards of neatness and cleanliness; and travel in unfamiliar place and use public transportation. (T. 785-786.)

---

[2] The GAF Scale "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Pollard v. Halter,* 377 F.3d 183, 186 n. 1 (2d Cir.2004). A GAF score between fifty-one and sixty indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A GAF score between forty one and fifty indicates "serious symptoms" (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) *or* any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work). *See* Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., Text Rev.2000).

The ALJ provided Dr. Noia "some weight," because he was an acceptable medical source who treated Plaintiff. (T. 48.) However, the ALJ stated Plaintiff had "more extensive limitations" than those imposed by Dr. Noia. (*Id.*) The ALJ afforded Dr. Beckman's opinion of Plaintiff's mental health limitations "not. . .great weight," because she was not familiar with his mental symptoms, didn't treat Plaintiff for mental health, and was not a mental health specialist. (*Id.*) Further, the ALJ reasoned Dr. Beckman's opinion "overstate[ed] the limitations that [he] found to be credible." (*Id.*) The ALJ gave Nurse Burnside "some weight," reasoning even though he was a nurse practitioner, he examined claimant for two years. (T. 49.) However, the ALJ also reasoned Nurse Burnside's opinion only deserved "some weight" because the RFC was co-signed by an illegible signature of a supervisor, and was not supported by Nurse Burnside's treatment notes. (*Id.*)

Plaintiff argues the ALJ failed to provide proper weight to the treating physician, Dr. Beckman, and to the treating nurse practitioner, Nurse Burnside. (Dkt. No. 11 at 12-16 [Pl.'s Mem. of Law].)

The opinion of a treating source will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

The following factors must be considered by the ALJ when deciding how much weight the opinion should receive: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). The ALJ is

required to set forth his reasons for the weight he assigns to the treating physician's opinion. *Id.* Failure to provide good reasons for failing to credit the opinion of a treating physician constitutes grounds for remand. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

The ALJ's RFC is not supported by substantial evidence; although the ALJ provided the proper form for assigning weight to the opinions in the record, he falls short on substance. First, the ALJ afforded Dr. Noia's opinion "some weight," but stated Plaintiff's condition had "more extensive limitations" than those Dr. Noia imposed. (T. 48.) The ALJ restates Dr. Noia's opinion and limitations, but it is not clear from the decision what aspects of that opinion he adopted or how his RFC reflects "more extensive limitations." The ALJ's RFC does limit Plaintiff to simple, routine, and repetitive work with only occasional interaction with others; however, these limitations actually appear to be less extensive, not more, than Dr. Noia's opinion. Dr. Noia opined Plaintiff had difficulty dealing with stress  and a mildly impaired memory, which is not present in the RFC. (T. 673-674.) Even assuming these limitations were included in the ALJ's limitations to "simple, routine, repetitive tasks," it still is not clear what the "more extensive limitations" are that the ALJ alluded to, or how they are reflected in his RFC determination.[3]

---

[3]    Courts have held that when medical evidence demonstrates that a plaintiff can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, limiting a claimant to only unskilled work sufficiently accounts for such limitations. *See Bartell v. Comm'r of Soc. Sec.,* 5:13-CV-843, 2014 WL 4966149, at *3 (N.D.N.Y. Sept. 30, 2014) (holding the ALJ adequately factored in limitations in maintaining concentration, persistence and pace and difficutlies dealing with stress by limiting plaintiff to simple unskilled work)*, McIntyre v. Colvin, 3*:12-CV-0318, 2013 WL 2237828, at *4 (N.D.N.Y. May 21, 2013); *Woodmancy v. Colvin,* 5:12-CV-991, 2013 WL 5567553, at *4 (N.D.N.Y. Oct.9, 2013) (holding that the ALJ did not err when she failed to make specific accommodations for a claimant's impaired ability to cope with work stress, because the ALJ relied on the opinion of a medical expert, who opined that the claimant could still perform basic work tasks despite his difficulty handling stressors).

The ALJ stated, as a nurse practitioner, Nurse Burnside's opinion was "not entitled to the weight of an acceptable medical source under [the] regulations." (T. 49.)[4] The ALJ was correct in this assertion; however, the other reasoning he provided for affording Nurse Burnside's opinion "some weight" was not consistent with the record. The ALJ afforded Nurse Burnside's opinion only "some weight" reasoning that it was unclear who else signed the form and the opinion was not supported by treatment notes. As previously stated, a simple search of Plaintiff's record showed Dr. Kang as the supervising physician in Plaintiff's care. Therefore, the ALJ improperly used an illegible signature as means to discredit the opinion, when the signature was reasonably interpreted given the treatment records. The ALJ also reasoned Nurse Burnside's opinion deserved "some weight" because it was not supported by treatment notes, specifically, the ALJ's interpretation that Plaintiff "improved substantially" and was "generally stable." (T. 49.)

The records from Liberty Resources indicated a decrease in symptoms, and even noted a "dramatic" decrease in auditory hallucinations at one point. (T. 759.) However, despite the decrease in symptoms, treatment notes recorded Plaintiff's ongoing psychotic symptoms including visual and auditory hallucinations, anxiety, and paranoia. (T. 744-781 and 320-346.) The record also did not indicate Plaintiff was "stable" as the ALJ asserts. (T. 49.) Nurse Burnside specifically noted Plaintiff's symptoms "[could] and likely [would] occur with the stress of forced social interaction." (T. 789.) Nurse Burnside's treatment notes supported the limitations he imposed on Plaintiff, despite Plaintiff's improvement with treatment and medicine. The ALJ erred in

---

[4]       Acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists and qualified speech-language pathologist. *See* 20 C.F.R. §§ 404.1513(a) and 416.913(a). "Other sources" include medical sources not listed above, such as nurse-practitioners, physician's assistants, naturopaths, chiropractors, audiologists, and therapists. *See* 20 CFR. §§ 404.1513(d) and 416.913(d).

15

equating Plaintiff's improvement with stability and in overlooking treatment notes which indicated despite improvement Plaintiff still suffered from symptoms and limitations.

Although Dr. Beckman treated Plaintiff for primarily physical impairments, she also completed a medical source statement regarding his mental limitations. (T. 784-786.) To be sure, the ALJ erred in concluding Dr. Beckman's opinion deserved less weight because it stated greater limitations than he found to be credible. *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999) ([a]n "ALJ cannot arbitrarily substitute his own judgment for a competent medical opinion"). The ALJ was correct in assessing Dr. Beckman's opinion based on the fact that she did not treat Plaintiff for his mental condition, and was not a mental health specialist. (T. 48.)

The Plaintiff further argues the ALJ's RFC analysis failed to provide for the "marked" limitations in social functioning found at step three. (Dkt. No. 11 at 16-18 [Pl.'s Mem. of Law].) At step three the ALJ determined Plaintiff had "marked" limitations in social functioning. (T. 44.) Social functioning involves a plaintiff's ability to "interact independently, appropriately, effectively and on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00. To have a "marked" means more than moderate but less than severe. 20 C.F.R. §§ 404.1520a and 416.920a. The ALJ concluded Plaintiff had a marked limitation in this area based on his testimony regarding his nervousness and paranoia around people and large groups, and that he tends to stay at home. (T. 44.)

Defendant argues the ALJ properly assessed Plaintiff's mental health limitation at step three and in his RFC analysis, as they are two distinct processes. (Dkt. No. 15 at 11 [Def.'s Mem. of Law].) While the Defendant is correct in her assertion that the

limitations found at step three of the sequential process are not a RFC assessment[5], the process is nonetheless "sequential," and therefore each step builds on, or takes from, the previous step. The issue here is not whether the ALJ provided a proper analysis of Plaintiff's mental limitations at steps three and in his RFC analysis, the issue is whether the ALJ's RFC analysis reflects the functional limitations found at step three. The ALJ states at the conclusion of his step three analysis, "the following [RFC] assessment reflects the *degree of limitation* I have found in the 'paragraph B' mental function analysis;" however, the degree of limitation was not reflected. (emphasis added) (T. 45.)

The ALJ's discussion provided no analysis or explanation as to how a "marked" limitation translated to "occasional" interaction with supervisors, co-workers and the public or is reflected in his RFC assessment. This error is magnified as this Court noted in Part IV.B, the ALJ erred in his evaluation of the medical evidence in the file. The ALJ's finding of "marked" limitations at step three correspond with his RFC analysis that Plaintiff's limitations are "more extensive" than Dr. Noia's limitations. His findings of "marked limitations" in social functioning are also supported by Nurse Burnside's treatment notes, but they are still not reflected in the actual RFC. Further, because this matter already requires remand for clarification as to the weight assigned to the medical opinions in the record, the ALJ should clarify his RFC analysis regarding Plaintiff's limitations in the area of social functioning; specifically how "marked" limitations of social functioning is represented in his RFC analysis.

---

[5]        The psychiatric review technique described in 20 C.F.R. §§ 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form ("PRTF") requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF. SSR 96-8p:Policy Interpretation Ruling Title II and XVI: Assessing Residual Functional Capacity in Initial Claims.

**C.      Whether the ALJ Properly Evaluated Plaintiff's Credibility.**

After carefully considering the matter, the Court answers this question in the negative, in part for the reasons stated in Plaintiff's memorandum of law.  (Dkt. No. 11 at 18-20 [Pl.'s Mem. of Law]).  The Court adds the following analysis.

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence."  *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir.1992).  However, the ALJ  "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record."  *Montaldo v. Astrue*, 10-CV-6163, 2012 WL 893186, at *17 (S.D.N.Y. Mar. 15 2012).  "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief."  *Rockwood*, 614 F. Supp. 2d at 270.

"The ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  First, the ALJ must determine whether the claimant has medically determinable impairments, which could reasonably be expected to produce the pain or other symptoms alleged."  *Id.*, at 271.

> Second, if medically determinable impairments are shown,
> then the ALJ must evaluate the intensity, persistence, and
> limiting effects of the symptoms to determine the extent to
> which they limit the claimant's capacity to work.  Because an
> individual's symptoms can sometimes suggest a greater
> level of severity of impairment than can be shown by the
> objective medical evidence alone, an ALJ will consider the
> following factors in assessing a claimant's credibility: (1)
> claimant's daily activities; (2) location, duration, frequency,
> and intensity of claimant's symptoms; (3) precipitating and
> aggravating factors; (4) type, dosage, effectiveness, and

side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Id.*

Here, the ALJ determined Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were "not credible to the extent they [were] inconsistent with the [RFC] assessment." (T. 46.)

To be sure, although a "[plaintiff's] credibility may be questioned if it is inconsistent with the medical evidence . . . , it is improper to question the plaintiff's credibility because it is inconsistent with the RFC determined by the ALJ." *Gehm v. Astrue,*10-CV-1170, 2013 WL 25976, at *5 (N.D.N.Y. Jan. 2, 2013); *see also Patterson v. Astrue,*11-CV-1143, 2013 WL 638617, at *14 (N.D.N.Y. Jan. 24, 2013) ("This assessment of plaintiff's credibility is formed only on the basis of how plaintiff's statements compare to the ALJ's RFC assessment. The ALJ's analysis is therefore fatally flawed, because, it demonstrates that she improperly arrived at her RFC determination before making her credibility assessment, and engaged in a credibility assessment calculated to conform to that RFC determination."). Courts have concluded that despite this language, an ALJ's credibility determination may still be proper, if the ALJ provided a detailed discussion of Plaintiff's credibility "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood*, 614 F. Supp. 2d at 270.

Although the ALJ improperly stated Plaintiff was not credible insofar as his statement were inconsistent with the RFC; the ALJ does go on to provide a detailed analysis of his credibility determination. However, the ALJ's analysis is flawed.

The ALJ placed "great emphasis" on the fact that Plaintiff worked as a cook while incarcerated. (T. 47.) The ALJ concluded that this "demonstrate[ed] that the [Plaintiff] [had] been able to perform substantial work-related functions successfully despite his impairments and since his alleged onset date. The nature of this work [was] consistent with the [Plaintiff's] RFC, which limits him to light work and only occasional interaction with others." (T. 47.) First, this reasoning is inappropriate because, "the ability to perform job-like duties in a highly regimented and structured environment like a correctional facility does not necessarily translate to an ability to satisfy the demands of competitive, remunerative work on a sustained bases." *Cox,* 993 F. Supp. at 184. Second, contrary to the ALJ assertion, this work was not consistent with Plaintiff's RFC, as it was determined at step four that Plaintiff was unable to return to his past relevant work as a cook. (T. 49.) Therefore, for the reasons stated herein, remand is necessary for a proper evaluation of Plaintiff's credibility.

**D.    Whether the ALJ Properly Solicited Testimony From the VE.**

After carefully considering the matter, the Court answers this question in the negative, in part for the reasons stated in Plaintiff's memorandum of law.  (Dkt. No. 12 at 8-10 [Pl.'s Mem. of Law]).  The Court adds the following analysis.

As explained in Parts IV.B. and C. of this Decision and Order, the ALJ's RFC determination is not supported by substantial evidence.  Accordingly, the ALJ's determinations at step five of the sequential analysis is not based on substantial evidence because it was made in reliance on the opinion of a vocational expert, who rendered her opinion based on a hypothetical that is not supported by substantial evidence. Therefore, remand is necessary on this basis.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 11) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 15) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that this matter is **REMANDED** to Defendant, pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Decision and Order.

Dated:     July 1, 2015
           Syracuse, NY

Glenn T. Suddaby
U.S. District Judge